IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
CA No.: 5:20-CV-00504-M

LUZ HERNANDEZ, on behalf of herself
and all others similarly situated,

    *Plaintiff,*

    v.

MOBILE LINK (N.C.) LLC,
MOBILELINK NORTH CAROLINA
LLC, CRICKET WIRELESS LLC

    *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)

**PLAINTIFF'S SECOND AMENDED
COLLECTIVE/CLASS ACTION
COMPLAINT**

COMES NOW, Plaintiff Luz Hernandez, on behalf of herself and all others similarly situated, by and through her undersigned counsel, and hereby sets forth this collective action for violation of the Fair Labor Standards Act under § 216(b), and a representative action under the North Carolina Wage and Hour Act pursuant to Fed. R. Civ. P. 23, against Defendants Mobile Link (N.C.) LLC, Mobilelink North Carolina LLC, (collective "MobileLink Defendants") and Cricket Wireless LLC (hereinafter "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff, on behalf of herself and all others similarly situated, brings this action against Defendants under the Fair labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, for unpaid overtime compensation, unpaid wages and related penalties and damages.

2.    Plaintiffs consist of current and former employees working at Defendant

Cricket's retail stores and on behalf of Defendant Cricket, as Mobile Link is Cricket Wireless' largest authorized retailer. Defendants have a policy, pattern, or practice of failing to pay employees for all scheduled and overtime hours worked, failing to pay employees all earned, promised, and accrued wages, and forbidding employees to record all hours worked. In particular, throughout the relevant period, Defendants have maintained a corporate policy of failing to compensate employees for all hours worked, including, but not limited to, mandatory pre-shift and post-shift work, working through lunch breaks, working off the clock as required by Defendants, and failing to compensate employees at the promised rate for hours worked less than 40 per week and/or the promised premium overtime rate for all hours worked in excess of forty (40) per week.

3.     Defendant's pay practices and policies are in direct violation of the FLSA and the NCWHA; and therefore, Plaintiff, on behalf of herself, and all others similarly situated, seek promised wages and overtime premiums for all regular-rate and overtime work required, suffered, or permitted by Defendant, liquidated damages and/or other damages as permitted by applicable law; attorneys' fees, costs and expenses incurred in this action.

4.     Plaintiff brings this action for violation of the FLSA as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class:

> All individuals who were, are, or will be employed at Defendants' North Carolina retail stores who were compensated on an hourly basis but not compensated for all of their hours worked, including, but not limited to, above forty (40) per week any time within three years prior to the commencement of this action, through the present.

2

5. Defendants are liable for their failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

6. Plaintiffs who elect to participate in this FLSA collective action seek compensation for all pre-shift and post-shift work performed for Defendants, compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, pre-judgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

7. Plaintiff also brings this action, on her own behalf, and as a representative of similarly situated current, former, retail sales hourly associates, employed by Defendants at their retail stores in North Carolina, under the NCWHA. Plaintiff, who is a North Carolina resident and who worked for Defendants in North Carolina, asserts that she and the putative class, who work or worked for Defendants in North Carolina, are entitled to compensation for all work performed for Defendants, including, but not limited to, before and/or after their scheduled shift, or for hours worked that Defendants simply refused to recognize as hours worked during the workday. Additionally, whether the workweek totaled greater or fewer than forty (40) hours, compensation at the appropriate regular and overtime rate for all hours worked in excess of forty (40) per week, for an equal amount of liquidated damages, pre-judgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d).

8. Plaintiff seeks class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendants' employees in North Carolina:

All individuals who were, are, or will be employed at Defendants' retail stores in North Carolina who were compensated on an hourly basis but were not compensated all promised, earned, and accrued wages due, including, but not limited to, compensation for all hours worked up to forty (40) in a week and for hours worked above forty (40) in a week within two years prior to the commencement of this action, through the present.

9.      Plaintiff Hernandez also brings this action individually for   race-based discrimination, harassment, and wrongful termination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et. seq*, and North Carolina Public Policy.   As alleged with greater specificity below, Defendants subjected Plaintiff Hernandez to race-based  discrimination, which created a hostile work environment.  When Plaintiff Hernandez reported the race-based discrimination against her and other employees at her store, Defendants took an unlawful adverse employment action against Plaintiff Hernandez.  Accordingly, Plaintiff Hernandez seeks all available relief for these claims, including, but not limited to, back pay, front pay, past pecuniary losses, prejudgment interest, compensatory damages, punitive damages, attorneys' fees and costs, and all other relief permitted by applicable law.

**PARTIES**

10.      Plaintiff Hernandez is an adult citizen and resident of the State of North Carolina, currently living in Raleigh.  She worked as a store manager for Defendants at their Crossroads of Cary location in Cary, North Carolina, from approximately September 15, 2014, until April 11, 2020.

11.      Defendant Mobile Link (N.C.) LLC is a North Carolina limited liability corporation formed in 2011, with its principal place of business located at 12501 Reed

4

Road, Sugar Land, Texas 77478-1409. Defendant Mobile Link (N.C.) LLC's registered agent in North Carolina is InCorp Services, Inc., with an address of 176 Mine Lake Court, Suite 100, Raleigh, NC 27615-6417.

12.     Defendant, Mobilelink North Carolina LLC, is a North Carolina limited liability corporation formed in 2019, with its principal place of business located at 12501 Reed Road, Sugar Land, Texas 77478-1409. Defendant Mobilelink North Carolina LLC's registered agent in North Carolina is InCorp Services, Inc., with an address of 176 Mine Lake Court, Suite 100, Raleigh, NC 27615-6417.

13.     Upon information and belief, Defendants are subsidiaries or affiliates of the national Mobilelink USA, which has its headquarters located at 12501 Reed Road, Sugar Land, Texas 77478-1409.

14.     Defendants own and operate retail locations which are in the business of selling Cricket Wireless telecommunications products and services, among other products and services.

15.     Defendant Cricket Wireless LLC is a Delaware Corporation, with its principal place of business located at 1025 Lenox Park Blvd NE Atlanta, GA 30319. Defendant Cricket Wireless LLC's registered agent in North Carolina is CT Corporation System, with an address of 160 Mine Lake Ct. Ste. 200, Raleigh, NC 27615-6417.

16.     At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d).

17.     At all relevant times, Defendants acted as joint employers with respect to the operation of the call centers, as defined in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d

125 (4th Cir. 2017) and as set forth below at ¶¶ 30-42.

18.     The FLSA collective consists of individuals who have worked for Defendants, are, were, or will be non-exempt employees paid an hourly wage, and who were not properly paid their overtime given Defendants' policy and practice of not correcting the ADP technical issues, directing Plaintiffs to omit certain hours worked and/or directing Plaintiffs to work "off the clock."

19.     Plaintiff brings this action on her own behalf and, pursuant to 29 U.S.C. § 216(b), as representatives of a proposed collective action of similarly situated employees.

## JURISDICTION AND VENUE

20.     The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon the claims brought under the FLSA, 29 U.S.C. § 201, *et seq.*, and under Title VII, 42 U.S.C. § 2000e, *et. seq.*

21.     Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA, because those state law claims arise out of the same nucleus of operative fact as the FLSA claims.

22.     The United States District Court for the Eastern District of North Carolina has personal jurisdiction because Defendant's primary place of business in North Carolina is in Wake County, which is located within this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendants conduct business and can be found within the Eastern District of North Carolina.

6

24.     All of the alleged causes of action can be determined in this judicial proceeding and this will provide judicial economy, fairness, and convenience to the parties.

## COVERAGE

25.     At all times material to this action, Defendants have acted, directly or indirectly, in the interest of an employer or joint employer with respect to Plaintiff.

26.     At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d) the NCWHA, N.C. Gen. Stat. § 95-25.2(5), and Title VII, 42 U.S.C. § 2000e *et. seq*.

27.     At all relevant times, Plaintiff was an employee engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

28.     At all times material to this action, Defendants were an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

## SINGLE ENTERPRISE AND JOINT EMPLOYMENT ALLEGATIONS

29.     Currently MobileLink operates nationwide with over 550 locations and are currently the largest authorized retailer for Cricket wireless.

30.     Defendant MobileLink operates out of Defendant Cricket Wireless

identified stores. Defendant MobileLink sells Defendant Cricket wireless services, products, Wifi, phones and accessories.

31.     Defendant MobileLinks' retail sales associates must participate in computer training provided by Defendant Cricket Wireless. The training includes Defendant Cricket Wireless' expectations regarding customer service, phone security protocols, anti- sexual harassment, and discrimination policies.

32.     Defendant Cricket Wireless inspects MobileLink stores on a monthly basis. Defendant Cricket Wireless inspects compliance regarding their products, specials, discounts, knowledge of the same, and that employees are wearing the Cricket Wireless uniforms and name tags.

33.     In fact, Defendant Cricket Wireless has at times advised Defendant MobileLink employees that MobileLink needed more employees to work and sell their Cricket Wireless products. Defendant Cricket Wireless will ask about the sales and whether MobileLink employees are aware of the new products and specials.

34.     Additionally, Cricket Wireless will conduct one annual compliance inspection where the entire store is inspected for safety concerns, privacy protocols, then ask a series of questions regarding product knowledge. If employees fail to answer the questions correctly, Defendant Cricket Wireless will send the results to Defendant MobileLink, advising that they will return to retest individuals.

35.     If during an inspection, Defendant Cricket Wireless products are not available or they are missing at the store, Defendant Cricket Wireless will issue ratings to MobileLink stores following such compliance inspections.

36.     Defendant MobileLink employees have complained to Defendant Cricket Wireless regarding their inspectors' concerns or issues at the stores.

37.     Defendant MobileLink store managers are required to attend Defendant Cricket Wireless training approximately three times a year where Defendant Cricket Wireless' employees provide training regarding sales techniques, presentation, accessories, all in an effort to increase sales.

38.      As such, Defendants MobileLink and Cricket Wireless have the power to direct, control, supervise, hire, fire, and set the terms of employment for all retail sales associates and store managers.

39.     Defendant Cricket Wireless provides computer systems and registers, which maintain Cricket Wireless' customer information.  As stated, the business name belongs to Defendant Cricket Wireless, and business cards also show Defendant Cricket Wireless.

40.     Customers do not distinguish Defendants, such that customers perceive Plaintiff and putative Plaintiffs as employees for all Defendants, given the Cricket Wireless uniform and business signage.  Similarly, Defendants' employees are unaware of any distinctions among them or view all Defendants as one company.

41.     All Defendants operate for a common business purpose, and the retail sales associates handle the customer service needs of Defendants MobileLink, MobileLink (NC), and Cricket Wireless.

## CONDITIONS PRECEDENT TO FILING LAWSUIT

42.     At all times material to this action, Named Plaintiff was an employee of Defendants within the meaning of the Title VII, 42 U.S.C. § 2000e.

43.    At all times material to this action, Defendants have continuously been an employer or joint employers, with twenty (20) or more employees, engaged in an industry affecting commerce within the meaning of the Title VII, 42 U.S.C. § 2000e.

44.    On or about July 16, 2020, Plaintiff filed a charge of discrimination against Defendants with the United States Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII.

45.    On December 7, 2020, the EEOC issued a Notice of Right to Sue to Plaintiff against Defendants, attached hereto as Exhibit A.

46.    Plaintiff has therefore exhausted all administrative remedies prior to commencing this action under Title VII.

## WAGE-RELATED FACTUAL ALLEGATIONS

47.    Defendants Mobile Link (NC) LLC and MobileLink North Carolina LLC are the largest authorized retailer for Defendant Cricket Wireless LLC with over 550 locations nationwide providing wireless services and products.

48.    Defendants employ retail sales specialists to sell wireless products and services.

49.    Defendants compensate retail sales specialists, assistant managers, and store managers on an hourly basis plus commissions.  Defendants classify these employees as hourly non-exempt under the FLSA.

50.    Retail sales specialists are paid from $9.00 per hour and up to $13.00 per hour.  Meanwhile, store managers earn approximately $15.00 per hour.

51.    Plaintiff worked for Defendants as a store manager, or in similar positions,

during the relevant period. Plaintiff was an hourly non-exempt employee, and her final wage rate was $15.00 per hour, plus commissions.

52.     Despite being a store manager, nearly every decision and document made by Plaintiff had to be approved by her District Manager, including hiring decisions.  In other words, Plaintiff did not exercise any judgment or discretion, and despite making recommendations for hiring or firing individuals, such recommendations were rarely, if ever, considered.

53.     Plaintiff Hernandez worked on average six (6) days a week.  Her hours were approximately 9:30 am to 4:00 pm, and she typically worked four (4) days per week. However, she also worked 9:30 am to 8:00 pm two (2) days per week.

54.     While Plaintiff was supposed to take a 30-minute break, this break would be interrupted almost daily, thus forcing Plaintiff to work on her breaks. Plaintiff was informed by Defendants that this 30-minute lunch break was automatically deducted from her recorded time every workday.  As such, her scheduled hours totaled a minimum of approximately forty-seven (47) to forty-eight (48) hours per week.

55.     As to other hourly employees, Defendants require hourly non-exempt employees to work various scheduled shifts:  3:30 pm to 8 pm; 8:30 am to 8:30 pm; or 8:30 am to 4:00 pm, typically five (5) days per week, and while they are supposed to take a thirty (30) minute lunch break every day, many times they are unable to take a lunch break because they have customers.

56.     These hours do not include time Plaintiff and putative Plaintiffs are required to work "off the clock" as required by the company to engage in work activities for

Defendants' benefit. By way of example, some of these activities included, but were not limited to, driving to other stores to pick up merchandise not located at their store, working at other store locations, participating in telephonic meetings held while off from work, or coming into the store during days off for miscellaneous issues.

57.     Since Defendants typically require hourly non-exempt employees to work "off the clock," hourly employees may work up to 41 and 44 hours per week.

58.     During the relevant time period, to satisfactorily perform their job duties, hourly employees are required to work at other stores, and such hours are not counted as hours worked during the same week; thus, they were not paid properly for those extra hours.

59.     Additionally, hourly employees typically arrive prior to the start of their scheduled shift, to unload or unpackage sales products, stock shelves, prepare paperwork, scan the products for inventory, ensure the work area is clean, and engage in store meetings to receive daily assignments.

60.     Plaintiffs were also required to participate in daily conference calls, which lasted anywhere from one (1) to two (2) hours. Plaintiffs were expected to dial into these calls regardless of whether they were clocked in for the start of their shift or on a break during their shift.

61.     This required pre-shift work was necessary to ensure that employees provide high-quality service and meeting the necessary sales goals during their shift. Employees who failed to prepare their work area before the beginning of their shift risked reprimands, which could lead to written warnings and termination by a District Manager or Sales

Director of North Carolina.

62. At the end of the shift, hourly employees engaged in activities that included, but were not limited to cleaning their work areas and inputting sales data regarding the day's work into Defendants' computer system.

63. Pursuant to Defendants' policy and practice requiring employees to come in pre-shift, stay post-shift, or engage in required work activities that were not recognized as hours worked, Defendants did not pay Named and putative Plaintiffs for all of their hours worked, including overtime.

64. Defendants' failure to compensate for all hours worked and to pay employees all promised, earned and accrued wages, has affected all putative Plaintiffs similarly.

65. Defendants, in their sole discretion, controlled Plaintiff's work schedule and rate of pay.

66. As to timekeeping policies, upon arriving to and leaving from work, Plaintiff and putative Plaintiffs clock in/out using Defendants' timekeeping application, called the "ADP App," on their phone. Access to the ADP app is location-based, which limits the employees' ability to clock in/out. Effectively, employees may only clock in and/or clock out on the ADP app while in the geographic area of their assigned "home" store.

67. Due to technical issues with the ADP App, Plaintiffs consistently submit a lot of "time corrections" because she and other employees' time was not recorded properly for numerous shifts.

68. Any time corrections submitted by Plaintiff or other employees would have to go to the District Manager, and the District Managers are supposed to send the

corrections to Human Resources for such changes to be accurately. However, Plaintiffs' District Managers frequently fail to send Plaintiffs' time corrections to Human Resources, or Defendants' management have simply advised Plaintiffs that certain hours will not be considered compensable.

69. When Plaintiffs have complained to management about such failures or not being able to record certain hours worked, management simply makes excuses as to why such issues have not been corrected. Despite requests to have Human Resources intervene, Human Resources would not intervene to resolve these issues.

70. As a result of the ADP App's unstable functionality, Defendants' failure to correct hours worked, or direction that some hours worked will not be considered compensable, Plaintiff's and putative Plaintiffs' recorded time has not reflected actual hours worked.

71. These issues have resulted in Plaintiff and putative Plaintiffs being paid substantially less than the pay to which she was entitled.

72. By failing to correct Named and putative Plaintiffs' incorrect recorded hours worked, which were inaccurate due to technical faults with the ADP App, Defendants maintained improper or inaccurate records, in violation of the FLSA, 29 U.S.C. § 211(c).

73. Additionally, Defendants have made it difficult for Plaintiff and putative Plaintiffs to receive their commissions. Defendants consistently change the policies for receiving their commissions even after such commissions have been earned. When employees have complained about their unpaid commissions, Defendants' managers have either ignored such complaints or they have advised Plaintiffs of the unanticipated changes

regarding commissions.

74.     Additionally, Plaintiff and putative Plaintiffs have not been properly paid for promised sick time, vacation time and other types of incentive pay.

75.     For example, Plaintiff was promised $300 incentive pay to train new managers. Pursuant to this promise, Plaintiff trained approximately four (4) new managers, but never received the money.

76.     During the last two years of her employment, Plaintiff was not paid for all of her vacation time. She was only paid for two weeks per year when she had accumulated three (3) weeks of vacation time.

77.     Defendants' unlawful compensation practices are currently the subject of an FLSA collective action, *Martinez et. al. v. Mobilink*, 4:20CV01149 (S.D. Tx. March 31, 2020), for nearly identical allegations. In that action, conditional certification was granted in November 2020.

## RACE-BASED DISCRIMINATION, HARASSMENT, AND WRONGFUL TERMINATION ALLEGATIONS

78.     At the time of her termination, Plaintiff and approximately five (5) other employees were either African-American, Hispanic, or Latinx.

79.     Plaintiff's  is Mexican, Hispanic or Latinx.

80.     The MobileLink location in which Plaintiff managed had a high customer base of African Americans, Hispanics, and/or Latinx.

81.     Under Named Plaintiff's leadership, the MobileLink store Plaintiff Hernandez managed was also one of the top selling stores in the State of North Carolina

and in the country.

82.     In December 2019, Plaintiff's former District Manager, "Ali," stated to her that the store she worked in was "ugly" because there were too many Blacks, Hispanics, and Latinx working there.

83.     Ali informed Plaintiff Hernandez that he did not want to hire anymore Blacks or Mexicans, and that he wanted "to change the face of the store," and that a manager should be white and/or that he needed a white person to be the manager.

84.     Ali, himself, was Indian and only wanted to see Caucasians or Indians in the store.

85.     Plaintiff made a complaint to Ali's supervisor regarding his racially charged comments and discrimination, but such complaints fell on deaf ears.  Ali's supervisor, Sales Director, Gary Warren, did nothing to correct Ali's behavior or otherwise discipline him.

86.     Given such failures, Plaintiff Hernandez contacted Defendants' Human Resources with her complaint, but she did not receive any assistance or resolution through that department either.   Despite also contacting MobileLink's Integrity Hotline, Named Plaintiff Hernandez never received a response to her numerous complaints.

87.     Because her previous attempts to report the harassment and discrimination had been ineffective, Plaintiff did not attempt to report again.

88.     In January 2020, Plaintiff was working by herself when Ali came in and asked her why she was by herself. Plaintiff explained that employees either had the day off or called out sick. Plaintiff then asked Ali about the candidates that she had sent him to be hired. In fact, one of the Hispanic interviewees was waiting in the store when Plaintiff

asked. In front of the interviewee, Ali reiterated that they were not going to hire more Mexicans or Black people.

89.    Shortly thereafter, a new District Manager, Trey William Cooper, took over the district. Cooper hired a Caucasian Assistant Manager without consulting Plaintiff even though she already had an Assistant Manager who was African-American.

90.    At the beginning of March 2020, Cooper demanded that Plaintiff hire his Caucasian female friend, Christina McAllister. Plaintiff responded by stating that it would cut other employees' hours. Cooper replied, "I'm not asking you, I'm telling you." When Plaintiff did not act quickly enough, Cooper hired his friend at a different store, and then had his friend transferred to Plaintiff's store.

91.    District Manager Cooper told Named Plaintiff Hernandez that the new Assistant Manager, Christina McAllister, told Cooper every day that Named Plaintiff was bad at her job, but instead of actually evaluating her profit margins or other metrics which exceeded company expectations, Cooper constantly threatened Plaintiff with termination if she "screwed up."

92.    Plaintiff worked with Cooper's friend for approximately one week before going on vacation. Cooper put his friend in charge of the store while Plaintiff was on vacation. Both Cooper and his Caucasian friend contacted Plaintiff while she was on vacation, to taunt her that his friend was doing a better job at being store manager in just one week.

93.    On or about April 9, 2020, while Named Plaintiff was on vacation, she received several calls from employees complaining that the new assistant store manager,

Christina McAllister, was making employees work off the clock, and that Cooper and McAllister were engaging in sexually inappropriate meetings in the back office, requiring employees to "knock" before entering the office and spending three (3) and four (4) hours in "meetings" behind a closed door. Such employees threatened to quit given these serious issues.

94.    Immediately after receiving such calls, on or about April 9, 2020, Named Plaintiff Hernandez, contacted the Sales Director for North Carolina, Gary Warren, who is directly responsible for the District Managers in North Carolina. Despite communicating employees' concerns regarding the inappropriate nature of District Manager Cooper's relationship with Assistant Store Manager, Christina McAllister, Sales Director, Warren, simply said he would "look into the matter" and would "talk" to Cooper.

95.    Within approximately two (2) hours after speaking with Warren, Named Plaintiff Hernandez received a call from District Manager, Cooper, who called under the auspice that he was inquiring about the store's petty cash. Named Plaintiff Hernandez took the opportunity to communicate the employees' concerns regarding his inappropriate relationship with Store Manager, McAllister. Cooper simply responded by stating, "He did not have to explain anything to Named Plaintiff."

96.    Coincidentally, on or about April 11, 2020 or two (2) days after Named Plaintiff reported District Manager Cooper and Store Manager McAllister's inappropriate relationship and work-place activities, Cooper contacted Named Plaintiff to come into the store for a meeting. During the meeting, Cooper falsely accused Plaintiff of stealing money, and Cooper claimed to have a video of Plaintiff stealing the money, but when Plaintiff

asked to see the video, Cooper refused to show it to her. Unwilling, or unable, to produce any such video, Cooper then berated Plaintiff for hiring her daughter, despite Plaintiff having no role in hiring her daughter. In fact, Named Plaintiff's former District Manager, Candice Kimble, was the person responsible for hiring Plaintiff's daughter.

97.    This meeting culminated in Cooper terminating Plaintiff under the guise that Plaintiff stole money from Defendants, despite no proof, and also of hiring her daughter in violation of Defendants' policies, even though it was Plaintiff's District Manager who hired her daughter.

98.    Named Plaintiff Hernandez maintains an audio recording of such meeting where Named Plaintiff Hernandez is heard stating that she was terminated because District Manager Cooper racially discriminated against her in favor of his Caucasian friend, Christina McAllister, and not because she stole any money. At that point, District Manager Cooper is heard shifting his justification for Named Plaintiff's termination from stealing money to hiring her daughter.

99.    Additionally, Plaintiff is aware that Defendants often pay Caucasian employees more than similarly situated minority employees.

100.   As a result of the repeated offensive statements directed at Named Plaintiff on account of her national origin, ethnicity, and/or race by her District Managers Trey Cooper and Ali Khan, including telling Named Plaintiff that the Assistant (Caucasian) Store Manager, Christina McAllister was doing a much better job than Named Plaintiff in just a week; identifying Named Plaintiff's store as "ugly" because there were too many minorities employed there; informing Named Plaintiff that they did not want to hire

anymore "Blacks" or Mexicans, that they wanted "to change the face of the store;" and a manager should be white and/or a white person needed to be the manager, Plaintiff's conditions of employment were undoubtedly altered due to racial discrimination and she experienced an abusive work environment.

101.    Because Named Plaintiff is herself a minority and given District Managers Cooper's and Ali's position of authority over her, Named Plaintiff felt targeted, threatened, and discriminated against by both District Managers Cooper and Ali Khan's offensive and discriminatory conduct and rhetoric.

102.    Plaintiff experienced a hostile work environment through the actions and statements of her District Managers and North Carolina Sales Director, Gary Warren and was wrongfully terminated on account of her race.

103.    Through Named Plaintiff's experiences of repeated degrading and offensive comments directed at Plaintiff on account of her race by her supervisors, commands from her supervisors to stop interviewing or submitting minority candidates for employment, inaction on Plaintiff's complaints to Defendants' managers and Human Resources of such conduct, and eventual termination of Plaintiff on account of her race, Defendants are liable to Plaintiff for hostile work environment and wrongful termination claims under Title VII.

## FLSA COLLECTIVE ACTION ALLEGATIONS

104.    Named Plaintiff brings the First Count of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of herself and all similarly situated employees.

105.    Members of the FLSA class are similarly situated.

106.    Members of the FLSA class have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed and fail to compensate them at the appropriate overtime rate for all hours worked in excess of forty (40) per week.

107.    There are numerous (in excess of 100) similarly situated current and former retail sales employees that fall within the scope of the aforementioned FLSA class.

108.    These similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

109.    Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

110.    Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Plaintiff.

111.    Named Plaintiff consents in writing to assert her claims for unpaid wages under the FLSA pursuant to 29 U.S.C. § 216(b).  Named Plaintiff's signed consent form is filed with the Court as Docket 1-2.  As this case proceeds, it is likely other individuals will file consent forms and join as opt-in plaintiffs.

112.    Named Plaintiff requests that she be permitted to serve as representative of those who consent to participate in this action, and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## NCWHA CLASS ACTION ALLEGATIONS

113.     Plaintiff brings the Second Cause of Action of the instant Complaint as a

class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all similarly situated employees, for relief to redress and remedy Defendants' violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, *et seq*.

114. <u>Numerosity</u>: The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff at this time, upon information and belief, the class comprises more than 100 individuals.

115. <u>Common Questions Predominate</u>: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

a. Whether pre-shift and post-shift work performed by putative Class Members is compensable under the NCWHA;

b. Whether Defendants' failure to compensate putative Class Members for pre-shift and post-shift work is in violation of the NCWHA;

c. Whether Defendants' failure to compensate putative Class Members all promised commissions is in violation of the NCWHA;

d. Whether Defendant failed to compensate putative Class Members at the earned, accrued, and/or promised rate for all hours worked up to 40 hours per week and in excess

of forty (40) each week pursuant to § 95-25.6;

e. Whether Defendant failed to compensate putative NC Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NCWHA.

116. Typicality: The claims of Named Plaintiff are typical of the claims which could be alleged by any member of the putative Class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay employees for all pre-shift and post-shift work, in addition to, any hours worked that Defendants simply refused to acknowledge as hours worked in excess of forty (40) each week at the appropriate hourly rate, and for all hours worked at the appropriate hourly rate. Defendant's compensation policies and practices affected all putative class members similarly, and Defendant benefited from the same type of unfair and/or unlawful acts as to each putative class member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

117. Adequacy of Representation: Plaintiffs are able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of interest between Plaintiff and members of the proposed class. Named Plaintiff has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

118.  Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all class members is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender.  Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action.  Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendant, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties.  The issue in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

119.  Public Policy Considerations: Defendant violated the NCWHA.  Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can

harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

120.    Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiff and members of the proposed class.

**COUNT ONE**
**Violation of the Fair Labor Standards Act**
**29 U.S.C. § 207**
**Brought by Plaintiff on Behalf of Herself and All Similarly Situated**
**Employees**

121.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

122.    At all relevant times, Defendants have been, and continue to be, "employers," "joint employers," engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

123.    At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Named Plaintiff, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

124.    At all relevant times, Defendants have had gross operating revenues in excess of $500,000.

125.    The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendant(s), to compensate all non-exempt employees at a rate of not less than

one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

126.    At all relevant times, Defendants, pursuant to their policies, practices, and use of the faulty "ADP app" timekeeping system, failed and refused to pay Plaintiff and putative Plaintiffs for all hours worked in violation of 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2.

127.    At all relevant times, Defendants, pursuant to their policies and practices, willfully failed and refused to pay for all hours worked to Plaintiff and putative Plaintiffs, including for required pre-shift and post-shift work performed by Plaintiff and putative Plaintiffs.

128.    Defendants' failure to pay Plaintiff and putative Plaintiffs for all hours worked, and at the appropriate overtime rate for hours worked in excess of forty (40) per week, in weeks where Plaintiffs worked over 40 hours, despite the fact that, upon information and belief, Defendants knew of its obligations under the law, entitles Plaintiff and putative Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendants cannot show they acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendants' acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

129.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of compensation for all required hours worked, and appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages,

prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

130.    Plaintiffs and putative plaintiffs each worked more than forty (40) hours in one or more workweeks within the applicable statutory period.

## COUNT TWO
### Violation of the North Carolina Wage and Hour Act
### N.C. Gen. Stat. § 95-25.6
### Brought by Plaintiff on Behalf of Herself and All Similarly Situated Employees

131.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

132.    The class period for this cause of action is at least two years from the date of the filing of the initial Complaint. *See* Dkt. 1.

133.    At all relevant times, Defendants have employed, and/or continue to employ, Named and Putative Class Members within the meaning of the NCWHA.

134.    Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

135.    The NCWHA includes in its definition of "wage," among other forms of compensation, "commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments."

136.    Under the same provision, § 95-25.7, wages based on bonuses or commissions "or other forms of calculation," "may not be forfeited unless the employee has been notified in accordance with G.S. 95-25.13 of the employer's policy or practice which results in forfeiture."   N.C. Gen. Stat. § 95-25.13(3), referenced in § 95-25.7,

27

requires that employers "[n]otify employees, in writing or through a posted notice maintained in a place accessible to its employees, at least 24 hours prior to any changes in prior wages."

137.    13 N.C. Admin. Code 12 § .0307(c) provides that any ambiguous policies and practices with respect to bonuses, commissions, and other forms of wage calculation "shall be construed against the employer and in favor of employees."

138.    Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment as well as making available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2).

139.    Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendants were required to pay Plaintiff and putative Class Members all wages, when due, for all promised earned and accrued regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA.

140.    Defendants intentionally refused to pay all wages due as set forth in the preceding paragraphs of this Complaint to Plaintiff and putative Class Members in violation of the NCWHA.

141.    Defendants were aware that Plaintiff and putative Class Members were not receiving all straight-time wages for all hours worked up to forty (40) and overtime wages for hours worked in excess of forty (40) per week per week pursuant to the promised

straight-time rate and corresponding premium overtime rate.

142. Defendants were aware that Plaintiff and putative Class Members were not receiving all promised commissions, incentive pay, vacation, and/or sick pay pursuant to promises Defendants made to Plaintiff and putative Class Members.

143. Defendants employed Named and Putative Class Members within the State of North Carolina.

144. At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to pay Plaintiff and putative Class Members all owed, earned, and promised wages, including for required pre-shift work performed by Plaintiffs, and at the appropriate overtime rate that Plaintiff and putative Class Members are lawfully entitled to for hours worked in excess of forty (40) in a single workweek.

145. Consistent with the above, Defendants' failure to pay Plaintiff and putative Class Members all owed, earned, and promised wages was in violation of N.C. Gen. Stat. § 95-25.6.

146. As a result of Defendant's unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

147. Defendant's failure to pay Plaintiffs all owed, earned, and promised wages, despite the fact that, upon information and belief, Defendants knew of its obligations under the law, entitles Plaintiff and putative Class Members to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

148. As a result of Defendants' unlawful acts, Plaintiff and putative Class Members have been deprived of all compensation due under the law, and are entitled to

recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.2(16), 95-25.12, 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d).

### THIRD CAUSE OF ACTION
**Race Discrimination - Hostile Work Environment and Wrongful
Termination
42 U.S.C. § 2000e *et seq.*

149.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

150.    Defendants are "employers" as defined by Title VII, 42 U.S.C. § 2000e(b), because they employ fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

151.    Plaintiff was repeatedly subjected to harassment and a hostile work environment in the form of unwelcome ridicule, abuse, humiliation, offensive comments, and beratement as a direct result of her race.

152.    Such discrimination and harassment was ongoing from December 2019 until Plaintiff was wrongfully terminated on April 11, 2020.

153.    Such discrimination and harassment was based on Plaintiff's race, all of which are protected statuses. Plaintiff's Caucasian co-workers and other Caucasian employees employed by Defendants were not treated in the same demeaning way that Plaintiff was treated.

154.    Such discrimination and harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.

155. Such discrimination and harassment was unwelcome.

156. While Plaintiff informed her supervisors and Defendants' Human Resources department, they all failed to take any prompt corrective action upon hearing reports of Plaintiff's treatment; her District Manager Ali, in fact, even perpetuated the harassment.

157. Plaintiff engaged in a protected activity under Title VII when she reported race-based discrimination and harassment to Defendants' management and Human Resources.

158. Plaintiff was discharged under the false pretense that she stole money from Defendants, despite no proof, and also of hiring her daughter in violation of Defendants' policies, even though it was Plaintiff's District Manager who hired her daughter.

159. In reality, Plaintiff's discharge was the result of Defendants' race-based discrimination against her and retaliation for Plaintiff reporting the race-based discrimination and harassment she had previously experienced. Plaintiff's discharge constitutes wrongful termination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).

160. As a direct and proximate result of Defendants' violation of Plaintiff's rights under Title VII, as alleged herein, Plaintiff has been injured and suffered damages, including lost income and benefits, loss of reputation, emotional distress and mental anguish, humiliation, inconvenience, and loss of enjoyment of life. Accordingly, Plaintiff is entitled to past pecuniary losses, interest, compensatory damages, and other relief provided for under Title VII.

161. Plaintiff is also entitled to reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 2000e-5(k).

162.    Additionally, since Defendants' violations of Title VII, as alleged herein, were intentional, willful, knowing and malicious, or with reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover punitive damages from Defendants, pursuant to 42 U.S.C. § 1981a(b)(1).

## FOURTH CAUSE OF ACTION
**Wrongful Discharge in Violation of North Carolina Public Policy**
**North Carolina Common Law**

163.    It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. §§ 143-422.2, Article I, Section 1 of the North Carolina Constitution, and ubiquitously throughout the statutes and laws of this State, that employees be free from race-based harassment, discrimination and retaliatory treatment in their employment.

164.    The termination of Plaintiff's employment, resulting from her complaints and suffering related to the acts of race-based discrimination and harassment was wrongful as against the public policy of the State of North Carolina.

165.    Such termination proximately caused Plaintiff to suffer emotional distress and other losses, as described above. Accordingly, Plaintiff is entitled to compensatory damages under North Carolina law, and interest pursuant to N.C. Gen. Stat. § 24-5(b).

166.    Defendants' acts constituted willful, wanton, and malicious conduct, entitling Plaintiff to punitive damages pursuant to Chapter 1D of the North Carolina General Statutes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and all those similarly situated, collectively pray that this

Honorable Court:

1.     Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiffs as representatives of all those similarly situated under the FLSA collective action;

2.     Issue an Order certifying this action as a class action under the NCWHA, and designate Named Plaintiffs as representatives on behalf of all those similarly situated under the NCWHA class;

3.     Award Plaintiffs and all those similarly situated actual damages for all unpaid wages found due, and liquidated damages equal in amount, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a1);

4.     Award Plaintiffs and all those similarly situated pre- and post-judgment interest at the statutory rate, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a);

5.     Award Plaintiffs and all those similarly situated attorney's fees, costs, and disbursements as provided by FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(d);

6.     Award Plaintiff Hernandez all back and front pay, and past pecuniary losses due as a result of Defendants' unlawful acts;

7.     Award Plaintiff past pecuniary losses, interest, compensatory damages, and punitive damages, as a result of Defendants' violation of Title VII, pursuant to 42 U.S.C.

§ 1981a, and violation of North Carolina Public Policy, pursuant to Chapter 1D of the North Carolina General Statutes and N.C. Gen. Stat. § 24-5(b); and

8.      Award Plaintiff pre-judgment interest; and

9.      Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this December 21, 2021.

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte C. Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that December 21, 2021, I electronically filed the foregoing true and accurate copy of **PLAINTIFF'S SECOND AMENDED COLLECTIVE/CLASS ACTION COMPLAINT** with the Court using the CM/ECF system, and have thereby electronically served the document to the following:

Ted N. Kazaglis
N. C. State Bar No. 36452
Jackson Lewis P.C.
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ted.Kazaglis@jacksonlewis.com

Joshua R. Adams
N. C. State Bar No. 49038
200 South College Street
Suite 1550, 15th Floor
Charlotte, NC 28202
Telephone: (980) 465-7239
Email: Joshua.Adams@jacksonlewis.com

*Attorneys for Defendants*

/s/ *Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Dr., Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiff*

35